[Cite as *State v. McKinney*, 2011-Ohio-4333.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

STATE OF OHIO,                        )
                                      )    CASE NO.  09 MA 111
    PLAINTIFF-APPELLEE,           )
                                      )
- VS -                                )    OPINION
                                      )
LAMAR McKINNEY,                       )
                                      )
    DEFENDANT-APPELLANT.          )


CHARACTER OF PROCEEDINGS:          Criminal Appeal from Common Pleas
                                   Court, Case No. 08 CR 528.


JUDGMENT:                          Affirmed.


APPEARANCES:
For Plaintiff-Appellee:            Attorney Paul J. Gains
                                   Prosecuting Attorney
                                   Attorney Ralph M. Rivera
                                   Assistant Prosecuting Attorney
                                   21 W. Boardman St., 6th Floor
                                   Youngstown, OH  44503


For Defendant-Appellant:           Attorney Gary Van Brocklin
                                   P.O. Box 3537
                                   Youngstown, OH  44513


JUDGES:
Hon. Mary DeGenaro
Hon. Cheryl L. Waite
Hon. Joseph J. Vukovich


                                   Dated:  August 24, 2011

DeGenaro, J.

{¶1} Defendant-Appellant, Lamar McKinney, appeals the June 4, 2009 judgment of Mahoning County Court of Common Pleas, convicting him of murder and felonious assault, both with firearm specifications, and sentencing him accordingly. On appeal, McKinney argues that the prosecutor committed misconduct during the closing arguments by commenting on the defense's failure to produce evidence of the murder victim's criminal history, despite the fact that the trial court had ruled earlier that such evidence would be inadmissible.

{¶2} Upon review, McKinney's assignment of error is meritless. Although the prosecutor's comment was improper, McKinney cannot demonstrate prejudice, since even absent those comments it is clear beyond a reasonable doubt that the jury would have found McKinney guilty. Accordingly, the judgment of the trial court is affirmed.

## Facts and Procedural History

{¶3} On April 23, 2008, in the Westlake Terrace housing projects, Marcus Easterly was shot six times and killed. During the same incident, Darrell Easterly (Marcus' cousin) was shot in the thigh, but survived. As a result of the shooting, on May 1, 2008, a Mahoning County grand jury indicted McKinney on one count of murder (R.C. 2903.02(A)(D)), an unclassified felony and one count of felonious assault (R.C. 2903.11(A)(2)(D)), a first-degree felony, both with R.C. 2941.145(A) firearm specifications.

{¶4} McKinney pled not guilty, retained counsel, and waived his speedy trial rights. The case proceeded to a jury trial, and McKinney's theory was that he acted in self-defense. Defense counsel's opening statements focused on McKinney's alleged fear of Marcus Easterly and commented that Marcus was a "large, mean, convicted felon." The State objected and requested a sidebar which took place off the record. Thereafter, defense counsel confined his comments to Marcus' reputation and McKinney's fear of him.

{¶5} During its case in chief, the State presented 18 witnesses. Their testimony established that on April 23, 2008, a dispute occurred between several groups at

Westlake Terrace. An initial dispute between two women caused Kenny Williams and Marquise Easterly to argue. Marquise told Kenny to get away from the apartment and pushed him. In response, Kenny hit Marquise in the head with a pipe, causing him to bleed. Marquise grabbed Kenny by the shirt and told him leave. While Marquise and Kenny were arguing, Lanier McKinney (McKinney's brother), jumped on Marquise's back, trying to get him off of Kenny. In an attempt to get Lanier off of his friend Marquise, Robin Briggs punched Lanier in the head. Lanier told his mother what happened, and she became angry, yelling at Briggs even after everyone had calmed down. According to Briggs, the mother called her other son, meaning Appellant McKinney, "to come down to the projects to take care of whatever happened down there." Tiana Easterly, Marcus' cousin, testified (without any objection from the defense) that she heard McKinney's mother say: "I'm gonna call Mar-Mar, and he gonna handle it."

{¶6} McKinney arrived and talked to Briggs and to Tiana about the incident. McKinney told Briggs he was mad that Briggs punched his brother, but that there was nothing he could do about it. Briggs assumed McKinney meant that he could not act on his anger because McKinney and Briggs' brother were close friends. At that time of that conversation, McKinney was sitting outside of the apartments at the top of some stairs and Briggs was standing at the bottom of the stairs.

{¶7} According to Tiana, who considered McKinney a "friend" before the shooting, McKinney also told her that Briggs was "wrong" for hitting his little brother and that he was mad. McKinney then told Tiana: "Excuse my language, but I'm about to light this mother f*cker up."

{¶8} Subsequently, Marcus pulled up in a vehicle with James Benson, got out, walked up to Briggs and asked Briggs what was going on. McKinney heard and stood up, telling Marcus, "Ain't nobody on that." Marcus then walked up the stairs towards McKinney, attempting to take off his shirt, as if he wanted to fight McKinney. Briggs, figuring McKinney had a gun, grabbed Marcus by the waist and tried to pull him away. Then McKinney pulled out a black .45 caliber gun and fired two shots towards the ground. According to eyewitnesses Briggs, Tiana and James Benson, Marcus did not have a

weapon, throw a punch or threaten McKinney prior to the shooting.

{¶9} McKinney then fired another shot towards Briggs and Marcus as they ran away. Briggs fell down, but was unharmed. That third shot hit Darrell in the thigh. Darrell fled inside an apartment.

{¶10} Briggs and Marcus took off running around one side of the building. Meanwhile McKinney ran around the other side of the same building. McKinney ultimately met up with Marcus and Briggs face to face on the other end of the building, at which time McKinney shot Marcus several more times. The last thing Briggs observed before running away was McKinney raising his gun up and Marcus raising his hands up to try to shield himself.

{¶11} On cross, Briggs testified that he did not think McKinney had planned to shoot Easterly, and opined that McKinney shot Marcus out of fear. He noted the look of surprise and fear on McKinney's face when he met up with Marcus on the other end of the building. On redirect, Briggs conceded that he did not know what was going through McKinney's mind at the time of the shooting.

{¶12} After the shooting, two YSU police officers, who were responding to the scene to help with crowd control, received a tip that a man was seen running away from Westlake Terrace and towards 417 Foster Street. When the officers arrived at 417 Foster, they saw McKinney climbing the front stairs of the duplex. He was out of breath, and sat down in a chair briefly, but ran in the house as the officers approached. McKinney came back out the front door shirtless. (McKinney's shirt was later found hidden inside the house after the property manager consented to a search by police.)

{¶13} After he exited the house, McKinney then pointed down Covington Road and told the officers (without being questioned): "He went that way wearing red." Further, McKinney stated several times that he was at 417 Foster to sell drugs to the people who lived there.

{¶14} McKinney was eventually arrested and taken to the Youngstown Police Department where he waived his Miranda rights. Detective-Sergeant Daryl Martin conducted a videotaped interview of McKinney shortly after his arrest. McKinney denied

ever seeing Marcus and denied shooting at anyone. McKinney claimed that he and Marcus were friends and that he had no problem with him. McKinney never mentioned anything about self-defense, even when the detective gave him an opportunity to do so. During the interview, McKinney acted "cocky," lounging back and stretching in his chair. He did not appear nervous.

{¶15} McKinney told Det. Martin that he got dropped off at the Westlake Terrace projects that day, but that he never went inside. He said he heard gunshots and that a woman named Char told him that someone at 417 Foster wanted to buy some crack cocaine, so he walked over there. When confronted with the fact that no crack was found at 417 Foster, McKinney stated that he had flushed it down the toilet.

{¶16} Darrell, Briggs, and Benson initially did not provide police any information about the shooting. However, approximately one week after the murder, they went to detectives and made formal statements, which were consistent with their trial testimony. Benson identified McKinney as the shooter from a photo array.

{¶17} Both Briggs and Tiana testified that McKinney contacted them from jail and asked them if they were planning to testify against him at trial.

{¶18} Six shell casings were recovered from the crime scene. Matthew White from the Bureau of Criminal Investigation testified that the shell casings were fired from a .45 caliber firearm. The two fired bullets and bullet fragments, recovered from the victim and scene were also from a .45 caliber firearm. White stated he could not determine whether the bullets and shell casings were fired from the same firearm.

{¶19} The coroner, Dr. Dan Galita, testified that Marcus suffered six gunshot wounds, three of which occurred when Marcus' back was turned to McKinney. One shot entered through the left side of Marcus' back, exited through the right side of his chest, and was likely the fatal wound. Another shot hit Marcus' right arm, which likely indicated a defensive wound. The third entered Marcus' lower left back and exited the left chest. The fourth and fifth shots hit Marcus' knees. The sixth shot hit the back of Marcus' left foot.

{¶20} At the close of the State's case in chief, the defense made a Crim.R. 29

motion for acquittal which was denied. The court then issued a ruling about what types of character evidence would be permitted regarding Marcus. Specifically, the court ruled that testimony about Marcus' reputation for violence would be permitted, but that specific acts evidence, particularly that Marcus was a convicted felon would not be permitted.

{¶21} McKinney testified in his own defense. As indicated, McKinney had initially denied all involvement in the shooting when he was arrested and maintained that story until trial. During trial, McKinney admitted he shot Marcus, but maintained it was in self-defense. McKinney claimed that he lied to police about his involvement and never mentioned that he acted in self defense because he was afraid of the police.

{¶22} He admitted he brought a .45 caliber firearm to Westlake Terrace that day, but claimed he was a drug dealer and carried it for protection. He testified that Marcus had a reputation as a violent killer and that he was afraid for his life. He claimed that he knew Marcus had shot a crack addict before and that he played with guns and robbed people and sold drugs.

{¶23} McKinney claimed that Marcus pulled out a revolver that day, but that he did not know what type of revolver, except that "if you shoot it, it don't leave shells." He testified that when Marcus pulled out the revolver, McKinney fired two warning shots into the ground and then ran around the building. When he met up with Marcus and Briggs on the other end of the building, McKinney stated that Marcus fired three or four shots at him, at which point McKinney started running away, while shooting blindly at Marcus.

{¶24} Lanier corroborated McKinney's testimony. Lanier stated that he saw Marcus shoot at McKinney with a small .38 caliber weapon, and that McKinney shot back. He said that after the shooting he saw Tiana come up to the fallen Marcus, take his gun and put it in her purse. However, on cross he admitted that he would "do anything" for his brother.

{¶25} Tamika Jones, McKinney's cousin, also testified for the defense. She also stated that Marcus pulled out a gun and that was why McKinney pulled out his gun. She said both men were shooting at each other, and also claimed that Tiana retrieved and hid Marcus' gun after the incident. On cross, her credibility was undermined by the fact that

she had never gone to the police with this story, and that she herself was a convicted felon. Further, Jones admitted on record that during a recess following her testimony, McKinney told her he loved her.

{¶26} Finally the defense presented a BCI witness, Donna Rose, who testified that a gunshot residue test performed on Marcus' left hand was positive. However, Rose admitted that this did not prove that Marcus shot a firearm; rather, the residue could have come from the weapon of the person who shot him, or have been transferred to his hand when if he touched his wounds. In other words, she could not say whether Marcus fired a gun that day.

{¶27} During the prosecutor's rebuttal closing argument, he commented on the fact that the defense failed to offer any evidence that Marcus was a convicted felon. The defense objected, but the trial court allowed the prosecutor to continue his closing statement. The defense orally moved for a mistrial based upon the prosecutor's comments, which was overruled. However, after concluding that the prosecutor's comment was misleading, the trial court gave a curative instruction to the jury, explaining to them that it had made a legal determination that no evidence regarding whether the victim had a felony record would be permitted during trial. At the prosecutor's request, the court also instructed the jury to disregard defense counsel's statement about Marcus' felony record during opening statements.

{¶28} The jury found McKinney guilty of all charges in the indictment. McKinney filed a renewed motion for mistrial which was overruled, and following a hearing the trial court sentenced McKinney to an aggregate term of 22 years to life in prison: 15 years to life on the murder charge, served consecutively to four years on felonious assault charge, served consecutively to three years on the firearm specifications, which merged at sentencing.

### Prosecutorial Misconduct

{¶29} In his sole assignment of error, McKinney asserts:

{¶30} "The improper rebuttal final argument of the State of Ohio denied Appellant a fair trial and is reversible error."

{¶31} McKinney contends that the prosecutor's comments during closing arguments constituted prosecutorial misconduct, thereby denying him a fair trial. As discussed, the defense's main theory of the case was that McKinney acted in self-defense when he shot and killed Marcus. Thus, whether Marcus was the initial aggressor and whether McKinney had a bona fide fear of imminent serious bodily harm from Marcus were relevant issues at trial. See *State v. Goff*, 128 Ohio St.3d 169, 2010-Ohio-6317, 942 N.E.2d 1075, at ¶36.

{¶32} During his opening statement, defense counsel commented about Marcus' felony criminal history, stating that Marcus was a "large, mean, convicted felon." The State objected and requested a side bar which took place off the record. Thereafter, defense counsel confined his comments to Marcus' reputation and McKinney's fear of him.

{¶33} After the State rested its case, the trial court issued a ruling about what type of character evidence the defense would be permitted to present regarding Marcus Easterly. The court ruled that testimony about Marcus' reputation for violence would be permitted, but that specific acts evidence, particularly that Marcus was a convicted felon would not be admissible. Specifically, the trial court stated:

{¶34} "THE COURT: There was an issue that's come up regarding the self-defense affirmative defense of the defendant. And based on the research that I was able to review, it appears as though testimony regarding the reputation of the victim for violence, carrying a weapon, and having killed an individual is [sic] proper topics and proper forms of the elements of self-defense. I have instructed counsel that specific acts, in particular, the fact that the victim was in the penitentiary for a weapons charge in a federal court, was a convicted felon, those specific references will not be permitted, and only those matters previously enumerated."

{¶35} Based upon that ruling, the defense presented no evidence regarding Marcus' felony record. Instead, McKinney himself testified about Marcus' reputation for violence. During closing arguments, defense counsel reiterated that point to the jury, explaining that McKinney knew Marcus to be a drug dealer and a killer and that he was

scared for his life.

{¶36} Then, during his rebuttal closing argument, the prosecutor stated the following, which forms the basis of McKinney's complaints of prosecutorial misconduct:

{¶37} "PROSECUTOR: * * * He [defense counsel] said [in his opening] that Marcus Easterly was a large mean, convicted felon. What evidence did we have of that? As a matter of fact, testimony was heard that Marcus was a little bigger than me, a little bigger than the defendant. Where was the mean, convicted felon part proved? Nothing. There was no evidence to that. None. None at all."

{¶38} The test regarding prosecutorial misconduct in closing arguments is two-fold. A reviewing court must determine whether the remarks were improper, and if so, whether they prejudicially affected the substantial rights of the defendant. *State v. Treesh* (2001), 90 Ohio St.3d 460, 464, 739 N.E.2d 749, citing *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 470 N.E.2d 883.

{¶39} As a general proposition, whether the comments were improper, "the prosecution is entitled to a certain degree of latitude in summation." *Treesh*, 90 Ohio St.3d at 464, citing *State v. Grant* (1993), 67 Ohio St.3d 465, 482, 620 N.E.2d 50; *State v. Liberatore* (1982), 69 Ohio St.2d 583, 589, 23 O.O.3d 489, 433 N.E.2d 561. Yet there are limits. As explained by the Ohio Supreme Court: "While we realize the importance of an attorney's zealously advocating his or her position, we cannot emphasize enough that prosecutors of this state must take their roles as officers of the court seriously. As such, prosecutors must be diligent in their efforts to stay within the boundaries of acceptable argument and must refrain from the desire to make outlandish remarks, misstate evidence, or confuse legal concepts." *State v. Fears* (1999), 86 Ohio St.3d 329, 332, 715 N.E.2d 136.

{¶40} Examples of improper comments during closing argument include: deliberately misstating evidence to the jury, *Treesh*, 90 Ohio St.3d at 466; making statements not based upon evidence in the record, id. at 467-468; referring to defense evidence as "garbage" and "a well conceived and well-presented lie," and intimating that defense counsel suborned perjury without evidence to support that, *Smith*, 14 Ohio St.3d

at 14. Further, it is improper for the prosecutor to deliberately denigrate defense counsel, *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, at ¶167, or for the prosecutor to express his or her personal belief or opinion as to the credibility of defense witnesses, *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173.

{¶41} Here, McKinney contends the prosecutor improperly commented on the defense's failure to present evidence that Marcus had a felony record. The State denies any impropriety, claiming the prosecutor was merely commenting upon the defense's failure to offer evidence in support of its case after he promised to do so, during its opening statement. See, e.g., *State v. Peeples*, 7th Dist. No. 07 MA 212, 2009-Ohio-1198, at ¶88 ("the prosecutor may comment upon the failure of the defense to offer evidence in support of its case.")

{¶42} However, the State's argument seems somewhat disingenuous considering that the court specifically ruled, before the defense began its case in chief and at the State's insistence, that evidence of Marcus' prior convictions would be inadmissible. The court, and it appears properly so, ruled that only reputation evidence about the victim could come in. See Evid.R. 404(A)(2); Evid.R. 404(B); Evid.R. 405(A); *State v. Barnes*, (2002), 94 Ohio St.3d 21, 25, 759 N.E.2d 1240 (holding that a "defendant asserting self-defense cannot introduce evidence of specific instances of a victim's conduct to prove that the victim was the initial aggressor.)

{¶43} For that reason, the prosecutor's statement was improper. Notably, the prosecutor was admonished by the trial court for his actions, as quoted below. And it falls within the sound discretion of the trial court to determine the propriety of closing arguments. *State v. Benge* (1996), 75 Ohio St.3d 136, 141, 661 N.E.2d 1019, citing *State v. Maurer* (1984), 15 Ohio St.3d 239, 269, 15 OBR 379, 473 N.E.2d 768.

{¶44} "PROSECUTOR: * * * I am allowed to attack what he failed to establish in his opening argument. In my closing argument what I said was that the defense in this case called the victim a convicted felon. I said there was no evidence ever shown that he was convicted of anything.

{¶45} "THE COURT: And you objected to the introduction of such evidence, did

you not?

**{¶46}** "PROSECUTOR: I did, and I still believe he's not allowed --

**{¶47}** "THE COURT: Then how can you comment on a piece of evidence that you say was not proven when in fact you knew that that was not true, that your client -- that the victim was in fact a convicted felon? You led the jury to believe from your comments that he was not because there was no proof of it. That was not what we talked about in chambers after about an hour discussion based on your request not to have any testimony regarding his record as a convicted felon. I agreed with you and suggested we leave that alone and only talk about the opinion testimony of the defendant regarding the victim. The avenue that was appropriate for your concern was a curative instruction regarding that issue; it was not to blindside the court by blurting out something you knew was a lie, you knew was untrue, by suggesting that the defendant did not put on evidence suggesting there was no evidence when, in fact, you know there was evidence, you provided that evidence, and that evidence was excluded by the court.

**{¶48}** " * * *

**{¶49}** "THE COURT: It misled the jury. There's no question about that.

**{¶50}** "PROSECUTOR: He misled the jury in his opening --

**{¶51}** "THE COURT: And we addressed that. We addressed that."

**{¶52}** As the prosecutor's comment was misleading and improper, we turn to the issue of prejudice. To determine whether the improper statements prejudicially affected the substantial rights of the defendant, courts must evaluate those statements in the context of the entire trial. *State v. Keenan* (1993), 66 Ohio St.3d 402, 410, 613 N.E.2d 203. "An improper comment does not affect a substantial right of the accused if it is clear beyond a reasonable doubt that the jury would have found the defendant guilty even without the improper comments." *Treesh*, supra, 90 Ohio St.3d at 464, citing *Smith*, supra, 14 Ohio St.3d at 15.

**{¶53}** McKinney was not prejudiced by the prosecutor's comments. McKinney admitted at trial that he shot Marcus and the evidence demonstrates that he also shot Darrell. The question is whether absent the prosecutor's comment the jury would have

still rejected McKinney's claim of self-defense.

{¶54} "Self-defense is an affirmative defense that requires a defendant to prove three elements by a preponderance of the evidence: '(1) the defendant was not at fault in creating the violent situation, (2) the defendant had a bona fide belief that [he] was in imminent danger of death or great bodily harm and that [his] only means of escape was the use of force, and (3) that the defendant did not violate any duty to retreat or avoid the danger.'" *Goff*, supra 128 Ohio St.3d at 176, quoting *State v. Thomas* (1997), 77 Ohio St.3d 323, 326, 673 N.E.2d 1339; and R.C. 2901.05.

{¶55} There was some conflicting evidence regarding whether McKinney was at fault in creating the violent situation. It is clear Marcus and McKinney verbally argued and that Marcus took off his shirt as if to demonstrate he wanted to fight. However, there is also testimony from two witnesses that McKinney was summoned to Westlake Terrace by his mother to "take care of things," meaning the earlier incident where Lanier was hit by Briggs. Further, there was testimony that McKinney was angry at Briggs; stated he would "light this mother f*cker up," and that when Marcus took Robin's side the argument between McKinney and Marcus ensued. And there is Briggs' weak evidence demonstrating that McKinney had a bona fide belief that the use of force was his only means of escape and that he did not violate any duty to retreat or avoid the danger. McKinney admittedly fired two warning type shots at the ground and ran away. He later ran into Marcus and Briggs on the other side of the apartment building, which is when he shot Marcus several more times. McKinney did not demonstrate why he had no other escape option, why he did not run into an apartment or a completely different direction from Briggs and Marcus.

{¶56} Moreover, at the heart of the defense is whether McKinney had a bona fide belief that Marcus posed an imminent danger of death or serious bodily harm to him. Absent the prosecutor's improper comments it does not appear that the jury would have reached a different conclusion on this issue. The State presented three eyewitnesses to the shootings, none of whom testified that Marcus had a weapon or threatened McKinney during the altercation. McKinney never told the police that he acted in self-defense, even

after one of the detectives expressly brought up the subject during questioning.

{¶57} Further, the physical evidence corroborated the testimony of State's witnesses and belied the self-defense theory. Six .45 mm shell casings were found, and McKinney admitted shooting Marcus with a .45 caliber weapon. The coroner testified that the gunshot wound to Marcus' hand was defensive in nature, which is consistent with Briggs' testimony that Marcus put his hand up to shield himself when McKinney began shooting at him. And importantly, the coroner testified that three of the six shots were fired when Marcus' back was towards McKinney.

{¶58} And although several defense witnesses, including McKinney himself, testified that Marcus shot at McKinney, there was no evidence to support this. No gun was found on Marcus' body. Although Marcus' hand tested positive for gunshot residue, the only physical evidence supporting the self-defense theory, the BCI witness explained that this did not necessarily mean that Marcus shot a gun that day. Rather it could have come from McKinney's weapon or could have been transferred to his hand when he touched his wounds.

{¶59} Further, there was extensive testimony about the general environment at the Westlake Terrace projects, ridden with crime, violence, drug abuse and drug trafficking. There was no testimony about the victim's good character, and McKinney testified that Marcus had a reputation for violence. Placed in the context of the entire trial, it is unlikely that the prosecutor's assertions about Marcus' lack of a felony record would have affected the jury's decision.

{¶60} Finally, the trial court gave a specific curative instruction to the jury:

{¶61} "THE COURT: Ladies and gentlemen, we are about to go into the jury instructions. Before I do that or a part of that, I want to tell you that during the closing -- remember I told you that anything said in opening is not evidence by the lawyers; anything said in closing by the lawyers is not evidence. But I am going to ask you to disregard and not give any credence to the comments made by the prosecutor when he indicated that there was no evidence provided by the defense that the victim had a criminal record or was a convicted felon. In my reading of the law, I made the

determination in this case that evidence would be allowed to be introduced regarding the opinion of the defendant for reputation of the victim for violence and for carrying a weapon, and that I would not allow the introduction of any evidence regarding any record, if there is one, of the defendant -- of the victim regarding criminal record or conviction. So, therefore, you must disregard any reference to that issue; okay?  All right."

**{¶62}** The jury is presumed to have followed the court's instructions. *State v. Raglin* (1998), 83 Ohio St.3d 253, 264, 699 N.E.2d 482.

**{¶63}** Even absent the prosecutor's comments it is clear beyond a reasonable doubt that the jury would have found McKinney guilty, and thus there was no prejudice. Accordingly, McKinney's sole assignment of error is meritless, and the judgment of the trial court is affirmed.

Waite, P.J., concurs.

Vukovich, J., concurs.